## THE FRANK G. FOWLER, etc. (Two Cases.)

*(District Court, S. D. New York. May 16, 1881.)*

1. PRIORITY—MARITIME LIENS—MATERIAL MEN—THE TRIUMPH—THE GLOBE— LIENS FOR SUCCESSIVE TORTS AND THE ORDER OF THEIR PAYMENT—LACHES.

Where a judgment for damages to a tow was recovered against a tug for negligence occurring on the sixth of November, and another judgment for similar acts of negligence, which occurred on the twenty-fifth of November, was recovered by other libellants, but the libel and the process in the latter case were dated December 23d, and in the former case December 24th, and both processes were returned by the marshal as served by arrest of the vessel on the same day, and the damages awarded to the latter exceeded the appraised value of the tug paid into the registry,—

*Held,* that the rule in this district as to priority of payment of claims of material men, making the time of the service of process the test, does not apply to the case of successive claims for torts.

*The Triumph,* 2 Blatchf. 433, note; *The Globe,* Id., discussed.

*Held,* that if that rule were applicable to cases of successive torts, it would not give any priority to either party in this case, because upon the proofs the process in both cases was served at the same time; that there is no presumption from the prior date of filing the libel, or the prior date of the process, that the process in the first case was served before that in the second, the marshal's returns merely showing service on the same day; that there is no reason or authority for distributing the fund between the two libellants; that the party suffering damage from the first tort acquired a lien therefor on the vessel to the extent of his damage, which interest is *quasi* proprietary in its nature, but without the power or right, except by enforcing the lien through proceedings *in rem,* to prevent the vessel from being used in commerce, and subjected to the attendant perils of navigation; that the interest in the vessel of this prior lienholder, like the interests of the owners, is subject to the rule of the maritime law, which makes the vessel *in solido,* and without regard to the particular nature of the proprietary interest therein, liable *in rem* for injuries done by the vessel through the torts of the master and mariners, and on this ground the party suffering the second damage is entitled to priority of payment.

*Also held,* that while the failure of the libellants, who suffered the first damage, to libel the tug before the voyage commenced, out of which the second cause of damage arose, was not laches operating to forfeit their lien, yet they took the chance of the tug incurring new liabilities, according to the principles of maritime law, and thus rendered the equity of the subsequent lienholder the stronger.

In Admiralty.

*Carpenter & Mosher*, for libellants, Conway and others.

*W. Mynderse*, for libellant, the Phœnix Insurance Company.

CHOATE, D. J. In both of these cases the steam-tug Frank G. Fowler has been condemned to satisfy the claims of the libellants. They are both cases of tort, or damage caused to the tow by faults of navigation on the part of the tug. In the case of Conway the cause of action grew out of the negligence and improper navigation of the tug on the sixth of November, 1880. In the case of the Phœnix Insurance Company it grew out of similar act of negligence on the twenty-fifth of November, 1880. The Phœnix Insurance Company filed its libel December 23, 1880. Conway and others filed theirs December 24, 1880. Processes of attachment were issued upon the same, dated as of the dates of the libel, respectively, and they were served by the marshal on the twenty-fourth of December. There is nothing in the marshal's returns or in evidence *aliunde* to show that either process was in fact served before the other. The tug has been released on an appraisement, and the deposit in court in the two cases of her appraised value—$4,500. The Phœnix Insurance Company has obtained a report of the commissioner in its favor for $6,383.33 damages. This report has been confirmed *nisi* and no exceptions have been filed. The libellant now applies for a final decree. The libellants Conway *et al.* having an interlocutory decree in their favor, and a reference to compute their damage, have not yet obtained a report of the commissioner, but their libel claims damages to the amount of $2,266.91, and they now resist the entering of a final decree in favor of the Phœnix Insurance Company which would absorb the whole fund in court, claiming that they are entitled to a priority of payment, and that the final decree in the case of the Phœnix Insurance Company should be only for such part of the fund as will remain after satisfaction of their damages. The Phœnix Insurance Company, on the other hand, claim that they are entitled to a priority in payment over the libellants Conway and others.

The question of the proper order of payment of claims of the same class which constitute maritime liens against vessels has been the subject of much discussion, and there is considerable diversity in the practice in different districts. The case which seems to have settled the rule in this district, as between material men, is the case of *The Triumph*, decided by Judge Betts in 1841, (reported in 2 Blatchf. 433, note.) He there held that where the fund was insufficient to pay all the claims the libellants were entitled to be paid in the order in

which the warrants of arrest were served on the vessel.  That learned judge appears to have based this decision, partly at least, on the nature of a maritime lien as defined by him.  Thus, he says:

"The meaning and efficacy of a maritime lien is that it renders the property liable to the claim without a previous judgment, or decree of the court, sequestrating or condemning it, or establishing the demand as at common law, and the action *in rem* carries it into effect.  *Ingraham* v. *Phillips*, 1 Day, 117; *Barber* v. *Minturn*, Id. 136.  Thus the appropriation of the *res* to that end becomes absolute and exclusive, on suit brought, unless superseded by some pledge or lien of paramount order; and it accordingly results, from the nature of the right and the proceedings to enforce it, that the first action which seizes the property is entitled to hold it, as against all other claims of no higher character.  Clerke's Praxis, tit. 44; Hall's Adm. Pr. 89; *People* v. *Judges of New York*, 1 Wend. 39.  The lien, so termed, is in reality only a privilege to arrest the vessel for the debt, which of itself constitutes no encumbrance on the vessel, and becomes such only by virtue of an actual attachment.  Hall's Adm. Pr. tit. 44; Abbott on Shipping, part 2, c. 3, 142; 3 Kent's Com. 169, 170; *People* v. *Judges of New York*, 1 Wend. 39.  Applying these principles to the case before the court, the prosecuting creditors (except seamen suing for wages) are to be satisfied in the order in which the warrants of arrest were served on the property, whether the vessel in kind or her proceeds in court.  Each action, with its appropriate costs, comes upon the fund according to the period of its commencement."

Although this decision, and the reasoning on which it is founded, especially the remarks quoted above, received the approval of Mr. Justice Nelson in *The Globe*, 2 Blatchf. 433, (1852,) this rule, as to the order of payment among material men, has been disapproved by other admiralty courts, and it has been held that the claims of material men intervening before a final decree are to be paid without reference to the dates of their attachments, in the inverse order of their creation, without distinction, however, or preference between those concurrently engaged in fitting the vessel for a particular voyage.  *The America*, 6 Law Rep. (N. S.) 264; *The Paragon*, 1 Ware, 322; *The Fanny*, 2 Low 508; *The Brig Omer*, 2 Hughes 96; *The E. A. Barnard*, 2 Fed. Rep. 719.  The reason given for this inverse order of payment is the same that controls in the case of successive bottomry bonds and claims for salvage, that the latest benefit to the ship is a benefit to all parties having a prior encumbrance thereon, including material men who have given her earlier credit.  This rule is insisted upon in these cases as one founded in the necessity of commerce, which gives the ship to her entire value, in case of necessity, whoever may be interested in her, as security to the material man

giving credit to her under those circumstances which, by the maritime law, create a lien. It is a singular circumstance that, in the case of *The Globe,* Judge Nelson apparently makes this very consideration a reason for giving priority to the material man making the first attachment, although it would not seem to be a reason for adopting such a rule of procedure. Thus he says:

"It has been argued that this maritime lien for supplies and material furnished at a foreign port is an abiding claim and adheres to the vessel, and may be enforced over all claims of a like nature subsequently accruing in the course of her employment. I cannot assent to this position. On the contrary, I am satisfied that the true rule upon the subject is that, in respect to maritime liens of this description, the party first instituting legal proceedings, for the pupose of enforcing his claim against the vessel, is entitled to satisfaction out of the proceeds of her sale. Upon any other view the vessel would afford no reasonable security to the merchant in making the advances or furnishing the necessary supplies, as, for aught he could know, the existing claims against her might exceed her value. It is apparent that to give this maritime lien the efficacy claimed would greatly embarrass and obstruct the commerce and navigation of the country. It would deprive the master in distant ports of the means of meeting the exigencies of the service, because the vessel would furnish no adequate security for the necessary supplies or repairs."

The learned judge then cites with approval Judge Betts' definition of a maritime lien, as an additional ground for giving the preference to the first attachment. I think, therefore, it must be conceded that at least one of the grounds upon which Judge Nelson approved this rule of priority in the case of material men has no application whatever to cases of successive claims founded in tort; as, for instance, claims for damages by collision or negligence. In these cases the creditors acquiring a lien are such *in invitum.* There is no credit given to the vessel. There is no consideration of the necessities of commerce requiring the security of the whole value of the vessel as a pledge for a *benefit conferred upon the faith of it,* to influence the determination of the question of priority. As to the other ground on which this rule of priority is based,—the nature of a maritime lien,— in fact the sole ground on which the case of *The Triumph* appears to proceed, it must also be conceded that later cases of the highest authority in this country and in England have held "the meaning and efficacy of a maritime lien" to be something very different from a "privilege to arrest the vessel for the debt which, of itself, constitutes no encumbrance on the vessel, and becomes such only by virtue of an actual attachment" as it is defined in the case of *The Triumph.*

Thus, in the case of *The Bold Buccleugh*, 7 Mo. P. C. 284,—a case twice argued,—the court says:

"A maritime lien does not include or require possession. The word is used in maritime law not in the strict legal sense in which we understand it in courts of common law, in which case there could be no lien where there was no possession, actual or constructive, but to express as if by analogy the nature of claims, which neither presuppose nor originate in possession. This was well understood in the civil law, by which there might be a pledge with possession and a hypothecation without possession, and by which in either case the right travelled with the thing into whosesoever possession it came. Having its origin in this rule of the civil law, a maritime lien is well defined by Lord Tenterden to mean a claim or privilege upon a thing to be carried into effect by legal process; and Mr. Justice Story (1 Sumn. 78) explains that process to be a proceeding *in rem*, and adds that, wherever a lien or claim is given upon a thing, then the admiralty enforces it by a proceeding *in rem*, and indeed is the only court competent to enforce it. A maritime lien is the foundation of the proceeding *in rem*—a process to make perfect a right inchoate from the moment the lien attaches; and whilst it must be admitted that where such a lien exists a proceeding *in rem* may be had, it will be found to be equally true that in all cases where a proceeding *in rem* is the proper course, there a maritime lien exists, which gives a privilege or claim upon the thing to be carried into effect by legal process. This claim or privilege travels with the thing into whosesoever possession it may come. It is inchoate from the moment the claim or privilege attaches, and when carried into effect by legal process, by a proceeding *in rem*, relates back to the period when it first attached."

This definition of a maritime lien was commented on and approved in *The Feronia*, L. R. 2 Ad. & Ec., 72. It is also approved to its full extent by the supreme court in *The Rock Island Bridge*, 6 Wall. 215. In *Ins. Co.* v. *Sherwood*, 14 How. 363, Mr. Justice Curtis, speaking in a case of collision, says: "The loss was the existence of a lien on the vessel insured, securing a valid claim for damages, and the consequent diminution of the value of that vessel." In the case of *The Triumph* no efficacy is given to the lien beyond the right of attachment on mesne process for the security of a debt of the owner. The cases he cites are some of them cases of attachment on mesne process, and he makes the maritime lien analogous to the right of the creditor to make such an attachment, which, indeed, takes effect only upon the levy of process on the property. A similar suggestion, made or supposed to have been made by Dr. Lushington, in *The Johann Friederich*, (1 Wm. Rob. 37,) is commented on by the court, and disapproved in *The Bold Buccleugh, ut supra*, 282. And the distinction between an attachment on mesne process which creates a lien only upon the

seizure, and a proceeding *in rem* in admiralty to enforce and give effect to an existing lien, is carefully pointed out by the supreme court in *Leon* v. *Garcelon*, 11 Wall. 189.

In this state of the authorities I am unable to follow the case of *The Triumph*, as furnishing a rule for the order of payment in a case of successive claims for tort, which seems not to be governed by the same reasons as to order of payment which apply to a case of several claims by material men. Nor is it possible to sustain the claim of the Phœnix Insurance Company to a preference under authority of the case of *The Triumph*, even if that case were applicable to a case of successive torts, because there is nothing to show that the attachment in its case was earlier than that in the case of Conway. Where several attachments are levied on the same property at the same time, the property attached is to be distributed among the several plaintiffs, if they recover judgments, as having an equal right thereto, and this rule seems to apply though the processes were delivered to the officer at different times. *Gates* v. *Bushnell*, 9 Conn. 530; *Shove* v. *Dow*, 13 Mass. 529; *Rockwood* v. *Varnum*, 17 Pick. 289. These returns of the marshal merely showing an attachment in each case on December 24th, there is no presumption from the difference in the dates of the processes that one was served before the other. If the right to a priority depends upon an earlier service, the time may be shown by evidence extrinsic to the return, though the return shows service on the same day. But a party claiming priority on this ground must make good his right by proof. Drake on Attach. §§ 261, 264, 265, and cases cited. If, therefore, the case of *The Triumph* applies to this case, it would seem that both of these libellants would be entitled to share in the fund, by the application of the rules that govern similar cases of attachment on mesne process; but, for the reasons already stated, I think that decision does not furnish the principle which controls the present case.

If, then, the test of the time of service of process be rejected, by what principle of the maritime law is the case governed? There are three possible theories of the case: (1) That the two parties be paid *pro rata;* (2) that the party suffering the first loss has the prior claim; (3) that the party suffering the second loss has the prior claim.

I think there is no authority which would justify a *pro rata* distribution of the fund. Judge Lowell, in the case of *The Fanny*, indeed says that the general rule in admiralty is that all lienholders *of*

*like degree* share *pro rata* in the proceeds of the *res*, without regard to the date of their libels or suits, if all are pending together. By "lien-holders of like degree," however, I understand him to mean lienhold-ers who by the rules of the maritime law are not, either from the nature of their claims or from the difference in time when they at-tached, entitled to any preference over each other. I think the sub-sequent part of his opinion shows that he does not regard similar claims arising at different times as liens of the same degree, since he distinctly approves the rule that material men are to be paid in the inverse order of the creation of their liens; and he approves the opin-ion of Judge Hall in *The America,* where it was held that a lien for damage by collision was of as high a character as the lien of a ma-terial man, and as between such claims they were to be paid in the order of their creation.

The argument for the parties first suffering damage is that they acquired a lien on the tug for their damages; that this was a subsist-ing right or interest on the twenty-fifth of November, when the dam-mage of the other party occurred; that it had not been forfeited or lost by laches; that whatever right or lien the party suffering the second damage acquired in the tug was acquired subject to this existing right and lien; that as their lien was good and available even against a *bona fide* purchaser without notice, so it must be good against a party acquiring any less interest than a purchaser; that the right of the party suffering the second damage cannot be greater than the right of a purchaser would be; that the reasons growing out of the neces-sities of commerce, which have led to the preferring of the last ma-terial man over the earlier ones, do not apply to successive torts, where the creditor is made such *in invitum,* and no credit is given to the vessel; that nothing has happened to displace the earlier lien, and being earlier in time it has the stronger equity. It is true that the delay in libelling the vessel from November 5th to November 25th cannot, on the authorities, be regarded as laches which will operate to extinguish the lien as against the vessel in favor of a purchaser. And the reason why the purchaser takes subject to the lien is that the purchaser takes by contract with the owner, and can take only the title which the owner has to convey, therefore he takes that title subject to all existing encumbrances, including the lien created by the former marine tort, which, as shown by the above cases, is in the nature of a tacit hypothecation of the vessel, an encumbrance upon

or diminution of the interest of the owner. But the right or interest created in the injured party by the second marine tort does not depend upon contract, but upon the principles of the maritime law relating to marine torts and their effect upon, or the claim that they create upon, the vessel. Now I think it is the established rule of the maritime law that for the torts of the master and mariners the vessel becomes bound to the injured party to the extent of the damage. A lien or tacit hypothecation is at once created and vested in the damaged party, subject to be defeated only by unreasonable laches in bringing the proceeding *in rem*, by which alone it can be enforced. A party who has already suffered such a damage has such a lien or hypothecation of the vessel. He is to that extent in the position of an owner,—he has a *quasi* proprietary interest in the vessel. It is true he cannot, as an owner, control her employment or prevent her departure on another voyage, except by the exercise of his right or power to arrest her for the injury to himself, and in some cases the second injury may be done before he has an opportunity to arrest her; yet if her continued employment is not his own voluntary act, nor with his own consent, it is his misfortune that the vessel in which he has an interest is used in a manner to subject herself to all the perils of navigation. This use, unless he intervenes to libel and arrest her, is perfectly lawful as against him. If she is lost by shipwreck, of course his lien becomes valueless, and I think his interest is not exempted from this other peril to which the vessel is liable, namely: that she may become bound to any party injured through the torts of the master and mariners. The principle as to marine torts is that the ship is regarded as the offending party. She is liable *in solido* for the wrong done. The interest of all parties in her are equally bound by this lien or hypothecation, whether the master and mariners are their agents or not. In the case of *The Aline*, 1 Wm. Rob. 118, Dr. Lushington says:

"I am also of opinion that neither the mortgagee nor bottomry bondholder could be a competitor with the successful suitor in a cause of damage, and for this reason that the mortgage or bottomry bond might and often does extend to the whole value of the ship. If, therefore, the ship was not first liable for the damage she had occasioned, the person receiving the injury might be wholly without a remedy, more especially where, as in this case, the damage is done by a foreigner, and the only redress is by a proceeding against the ship."

Commenting on this decision in the case of *The Bold Buccleugh, ut supra*, the court says:

"In that case there was a bottomry bond before and after the collision, and the court held that the claim for damage in a proceeding *in rem* must be preferred to the first bondholder, but was not entitled against the second bondholder, to the increased value of the vessel by reason of repairs effected at his cost. The interest of the first bondholder taking effect from the period when his lien attached, he was, so to speak, a part owner in interest at the date of the collision, and the ship in which he or others were interested was liable to its value at that date for the injury done, without reference to his claim."

I think the same principle is applicable to a prior lienholder, who, by the tort of the master and mariners, has become, so to speak, a part owner in the vessel. His property, the vessel, though not by his own voluntary act, has been used in commerce. That use was not tortious as to him. It is subject in that use to all ordinary marine perils. One of those marine perils is that it may become liable to respond to another party injured by the negligence of the master and mariners. No exception to the liability of the vessel, exempting the interests of parties interested in the ship, has been established by authority. To create such exceptions would greatly impair and weaken the security against negligent navigation, which the rule of liability of the vessel is at least partly designed to promote. Since the act of congress, passed in 1851, limiting the liability of ship-owners, their personal liability is in most cases of marine tort unavailable. That act itself implies that by the rule of the maritime law the party injured by a collision or other tort of the master and mariners has an unquestioned lien on the vessel *in solido*. In *The America, ut supra*, Judge Hall says:

"In short, all parties except seamen, holding ordinary maritime liens upon a vessel, are to some extent treated as though they had a proprietary interest in the ship; and their interests, whatever they may be, are subject to all liens which the necessities of the ship, or a collision caused by the carelessness or misconduct of those in charge, may subsequently impose."

For the reasons above stated, I think this is the true rule of the maritime law; and, applying it to the present case, the interest or lien of libellants Conway and others in the vessel was not exempt from becoming liable, like all other interests in the tug, to the lien of the party subsequently suffering damage by the tort of the master. The case has thus been considered without reference to the circumstance that the libellants Conway and others had an opportunity to libel the tug before she left this port upon the towing voyage, out of which the second cause of damage arose. While this failure to arrest the vessel was not laches operating to forfeit their lien, it yet gives the subse-

quent lienholder a stronger equity, since the first lienholder, in suffering her to go without arrest, clearly took the chances of her incurring new liabilities, according to the principles of maritime law, and in a sense may be said to have consented to her being employed in another towage service, out of which they must be held to have understood that such a claim for damage might grow.

On these grounds a decree will be entered for the payment of the fund in court to the libellant the Phœnix Insurance Company, in part satisfaction of its damages, unless an appeal be taken within the time prescribed by the rules of the court.