## THE EMILY SOUDER.

1. In June, 1865, the American steamer Emily Souder, owned by residents in New York, whilst on a voyage to that port from Rio Janeiro lost her propelling screw, and put into the port of Maranham, on the coast of Brazil, in distress. She was towed into that port by another steamer for which she had signalled. The captain was without adequate funds to make the repairs required and furnish the vessel with the supplies necessary to enable her to proceed on her voyage, or to pay the expenses of her towage into port, and of pilotage, custom-house dues, fees of the consul in the port, and expenses of medical attendance upon the sailors. Both he and the owners of the vessel were unknown in Maranham, and without credit there. Under these circumstances the captain borrowed of the libellants the necessary funds to enable him to pay these several expenses, and gave them drafts on the owners of the vessel in New York for the amount, payable thirty days after sight, which drafts were accepted on presentation, but were protested for non-payment; *Held*, 1st, that the items of expense for towage, pilotage, custom-house dues, consular fees, and medical attendance upon the sailors stood in the same rank with the repairs and supplies to the vessel, and that the libellants advancing funds for their payment were equally entitled as security to a lien upon the vessel ; 2d, that the drafts were only conditional payment, and did not discharge and satisfy the original debt.
2. After the libellants in one of the cases had agreed with the captain to advance all the funds required by him, the libellant in the other case, who had been first applied to by the captain, agreed to advance a portion of the funds, and did so ; *Held*, that this subsequent agreement did not affect the implied hypothecation of the vessel for the whole, the advances by both libellants having been made on the credit of the vessel and not solely on the personal credit of the captain or owners.
3. The presumption of law is, in the absence of fraud or collusion, that where advances are made to a captain in a foreign port, upon his request, to pay for necessary repairs or supplies to enable his vessel to prosecute her voyage, or to pay harbor dues, or for pilotage, towage, and like services rendered to the vessel, that they are made upon the credit of the vessel as well as upon that of her owners. It is not necessary to the existence of the hypothecation that there should be in terms any express pledge of the vessel, or any stipulation that the credit shall be given on her account.
4. The presumption in such cases can be repelled only by clear and satisfactory proof that the master was in possession of funds applicable to the expenses, or of a credit of his own or of the owners of his vessel, upon which funds could be raised by the exercise of reasonable diligence, and that the possession of such funds or credit was known to the party making the advances, or could readily have been ascertained by proper inquiry.

5. Liens for advances of funds for the necessities of vessels in a foreign port have priority over existing mortgages to creditors at home.

6. Where advances in a foreign port are made in gold, and drafts for the amount on the owners show that the payment to the parties making the advances is to be also in gold, the court may direct that its decrees be entered for the amount in like currency.

APPEALS from the Circuit Court for the Southern District of New York:

The firm of Packenham Beatty & Co., and also a certain Pritchard, filed separate libels in the District Court of the district just mentioned, against the steamer Emily Souder, an American vessel, owned in New York. The case was thus:

The steamer while on a voyage to that port from Rio Janeiro in June, 1865, lost her screw, and was compelled to put into the port of Maranham, on the coast of Brazil, for repairs. Her captain was without funds, sufficient to meet the expenses for these repairs, and other expenses incurred and to be incurred to enable the vessel to proceed on her voyage. The funds in his possession did not amount to $600, and both he and the owners of the vessel were unknown in the port of Maranham, and without credit. He accordingly applied to the consul of the United States there to find him a consignee, who would advance the necessary funds and attend to the business of the vessel. The consul applied in company with the captain to several persons without success, but finally an arrangement was made which was satisfactory, with the firm of Packenham Beatty & Co., merchants at that port; they to receive five per cent. commission on the amount advanced, and five per cent. commission for attending to the business of the vessel.

The steamer was repaired, and supplies furnished to enable the vessel to proceed on her voyage, and the funds for these items, and also to pay the charges for towing the vessel when disabled into port by another steamer which had been signalled for, and for pilotage, and for the dues at the custom-house, fees of the consul, and charges for medical attendance upon the sailors in port, were furnished by

the libellants. The different items were all submitted to the captain, and were approved by him before they were paid.

Pritchard, one of the libellants, was applied to by the captain to advance the funds before the arrangement was made with Packenham Beatty & Co., the other libellants. He then said that he would see what he could do. Afterwards he consented to advance a portion of the funds. Accordingly two drafts were drawn by the captain on the owners of the vessel in New York, for the amounts advanced, and one of them was given to Pritchard, and the other to Packenham Beatty & Co. The drafts were payable thirty days after sight in gold; the currency in which the advances were made. The drafts were presented and accepted, but on their maturity were protested for non-payment. The holders thereupon filed libels against the vessel, producing the drafts in court on the trial, and surrendering them for cancellation. Beatty, of the firm of Packenham Beatty & Co., and Pritchard, both testified that the advances in Maranham were made on the credit of the vessel, and would not have been made on any other condition; but that the drafts were taken only as conditional payment, and not in satisfaction of the sums advanced. The testimony of the captain was somewhat in conflict with this, he stating that the advances were made on the credit of the owners of the vessel and upon drafts on them, nothing being said at the time about bottomry of the vessel or raising money on her credit.

The vessel was at the time the advances were made under mortgage to the former owners for the purchase-money. They were obliged to take back the vessel before the libels were filed, and they were the claimants here.

The District Court rendered a decree in favor of the libellants in both cases, for the amounts advanced by them respectively, with interest, and directed that the amounts should be paid in gold coin of the United States. The Circuit Court affirmed the decrees and the claimants appealed to this court.

*Mr. Charles Donohue*, for the appellants ; *Mr. C. Van Sant-voord*, contra.

Mr. Justice FIELD delivered the opinion of the court.

The rule announced in *The Grapeshot*,* and there relieved from the supposed embarrassment of some previous decisions of this court, and repeated and affirmed in *The Lulu*,† and *The Kalorama*,‡ and followed in *The Patapsco*,§ disposes of the main question in these cases. The steamer here had entered the port of Maranham, on the coast of Brazil, in distress; she had lost her propelling screw, and was towed into port by another steamer, for which she had signalled. The repairs there made to the vessel, and the supplies furnished to her, and the expenses incurred on her account, were necessary to render her seaworthy and enable her to leave the port and prosecute her voyage to New York. The captain was without adequate funds for these purposes, the whole amount in his possession being under $600, and that sum being insufficient to meet the contingent expenses of the vessel. Both he and the owners of the vessel were unknown in Maranham, and without credit there. It was under these circumstances that he requested the consul of the United States in that port to obtain for him a consignee who would attend to the business of the vessel and advance the requisite funds. And it was only after applying without success to several parties, that he succeeded in inducing the firm of Packenham Beatty & Co., the libellants in one of these cases, to make the arrangement desired with the captain. The stipulation in the arrangement for five per cent. commission on the funds advanced, and five per cent. commission for attending to the business of the vessel was not unreasonable nor unusual. The steamer was detained at Maranham nearly five weeks, and the moneys advanced by the libellants, it is true, were not entirely for the repairs to the vessel and the supplies needed for the voyage; they were intended and applied in part to meet the expenses of

---

* 9 Wallace, 129.    † 10 Id. 192.    ‡ Ib. 204.    § 13 Id. 329.

her towage into port and of pilotage, and to pay the custom-house dues, consular fees, and charges for medical attendance upon the sailors. These various items, however, stood in the same rank with necessary repairs and supplies to the vessel, and the libellants advancing funds for their payment, were equally entitled as security to a lien upon the vessel. The items were all submitted to the examination of the captain, and were approved by him before they were paid.

The drafts given by the captain upon the owners of the vessel in New York were not received by the libellants in discharge and satisfaction of the sums advanced. They were received only as conditional payment. Such would be the presumption of law in the absence of any direct evidence on the point. For by the general commercial law of the world, a promise to pay, whether in the form of notes or bills, is not of itself the equivalent of payment; it is treated everywhere, in the absence of express agreement or local usage to the contrary, as conditional payment only. On principle, nothing can be payment in fact except what is in truth such, unless specially agreed to be taken as its equivalent. But here the evidence of the libellants is direct and positive that the drafts were only taken as conditional payment, and on the trial they were produced and surrendered for cancellation.*

The consent of Pritchard, the libellant in one of the cases, to advance a portion of the funds after Packenham Beatty & Co. had agreed to advance the whole, does not in our judgment in any respect affect the implied hypothecation of the vessel for the whole. The whole sum advanced was required, and the question is not whether it came from one or more parties, or whether the advances were made at one time or at different times, but whether they were made on the personal credit of the captain or of the owners, or were made on the credit of the vessel also. And upon this question there can be in this case no reasonable doubt. The presumption of law always is, in the absence of fraud or

---

* The Kimball, 3 Wallace, 37; The Bark Chusan, 2 Story, 456.

collusion, that where advances are made to a captain in a foreign port, upon his request, to pay for necessary repairs or supplies to enable his vessel to prosecute her voyage, or to pay harbor dues, or for pilotage, towage, and like services rendered to the vessel, that they are made upon the credit of the vessel as well as upon that of her owners. It is not necessary to the existence of the hypothecation that there should be in terms any express pledge of the vessel, or any stipulation that the credit shall be given on her account. The presumption arises that such is the fact from the necessities of the vessel, and the position of the parties considered with reference to the motives which generally govern the conduct of individuals. Moneys are not usually loaned to strangers, residents of distant and foreign countries, without security, and it would be a violent presumption to suppose that any such course was adopted when ample security in the vessel was lying before the parties. The presumption, therefore, that advances in such cases are made upon the credit of the vessel is not repelled by any loose and uncertain testimony as to the suppositions or understandings of one of the parties. It can be repelled only by clear and satisfactory proof that the master was in possession of funds applicable to the expenses, or of a credit of his own or of the owners of his vessel, upon which funds could be raised by the exercise of reasonable diligence, and that the possession of such funds or credit was known to the party making the advances, or could readily have been ascertained by proper inquiry.

In the cases at bar, the presumption is not only not repelled by any satisfactory evidence, but is supported by the positive testimony of the libellants. Beatty, who appears to have transacted the business of Packenham Beatty & Co. with the captain, and Pritchard, both declare in the most emphatic manner that they made the advances on the credit of the vessel, and would not have made them on any other condition.

The evidence of the captain, it is true, is to some extent in conflict with their testimony, but considering the circum-

stances under which the advances were made, it is entitled, as against their direct and positive declarations, to little weight. Perhaps, as suggested by the Circuit Court in its opinion, the inferences of the captain were not the result of any intended untruth on his part, but were drawn from the fact that nothing was said during the negotiation for advances intimating in terms that the libellants were to have a lien upon the vessel.

The fact that the vessel was, at the time the advances were made, under mortgage to the claimants, does not subordinate the lien of the libellants to the claim of the mortgagees. Funds furnished in a foreign port, under the circumstances and for the purposes mentioned in this case, have priority as a lien upon the vessel over existing mortgages. Advanced for the security and protection of the vessel, they were for the benefit of the mortgagees as well as of the owners. If liens created by the necessities of vessels in a foreign port could be subordinated to or displaced by mortgages to prior creditors at home, such liens would soon cease to be regarded as having any certain value, or as affording any reliable security.

As the advances were in gold, and the drafts on the owners in New York show that the payment to the libellants was to be made also in gold, the court below ruled rightly in directing its decrees to be entered for the amount due them in like currency.*

DECREE AFFIRMED in both cases, with interest and costs.

---

* Bronson *v.* Rodes, 7 Wallace, 229; Trebilcock *v.* Wilson, 12 Id. 687.